UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| IGNACIO JACOBO, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 09 C 3392 |
| WILL COUNTY SHERIFF'S OFFICE, et al., | ) | Judge Edmond E. Chang |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

*Pro se* plaintiff Ignacio Jacobo, currently an inmate in the Illinois Department of Corrections, has brought a civil rights suit, 42 U.S.C. § 1983, challenging his treatment at the Will County Adult Detention facility. Pending are Defendants' motions for summary judgment, R. 102, 114, and Jacobo's renewed motion for appointment of counsel, R. 133.[1] For the reasons discussed below, the Court grants the motion for appointment of counsel, R. 133; grants the medical defendants' motion for summary judgment, R. 102; and grants in part and denies in part the Sheriff's and deputies' motion for summary judgment, R. 114.

**I.**

The following facts are drawn from the parties' Local Rule 56.1 materials, R. 103, 116, 129, 131, and is presented in the light most favorable to Plaintiff, the non-moving party, with all reasonable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 639

---

[1] The Court has federal question jurisdiction under 28 U.S.C. § 1331.

(7th Cir. 2010). Plaintiff has also received the Local Rule 56.2 warning regarding summary judgment, R. 105, 117; *see also Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992), and the parties have complied with Local Rule 56.1.

On the evening of November 14, 2007, Jacobo was detained at the Will County Adult Detention Facility (for convenience's sake, the "Jail") facing various felony charges. R. 103 at 2, R. 116 at 1, R. 129 at 1, R. 131 at 1. Jacobo was being housed in a general population cell in the "A-Pod" area. R. 116 at 2, R. 131 at 1. At around 11:30 p.m., Defendant Rita Ramos, a nurse at the Jail, was called to Jacobo's cell. R. 103 at 2, R. 116 at 2, R. 129 at 1, R. 131 at 1. Jacobo claimed that he was suicidal and Nurse Ramos ordered Jacobo relocated to the Jail's medical unit and placed on suicide watch. R. 103 at 2-3, R. 116 at 2, R. 129 at 1, R. 131 at 1.

Members of the Jail's Emergency Response Team (ERT), Defendants Lopez, Calderon, and Owens, were called to transport Jacobo to the medical unit. R. 116 at 2, R. 131 at 1. Lopez, Calderon and Owens are Will County Sheriff's deputies working at the Jail. *Id.* Lopez, Calderon, and Owens transported Jacobo to Cell 8 in the medical unit. R. 103-2 at 6.[2] Cell 8 is around 10-feet by 10-feet with a bed. *Id.* at 7, 9. It has three block walls and a solid door with a window. *Id.* at 7. The detainee is locked inside the cell and there is a buzzer with a speaker that allows him to communicate with an officer. *Id.* Officers also come to the cell to speak to detainees. *Id.*

---

[2]The cites to pages of Jacobo's deposition are to the pages of the .pdf filed as an attachment to R. 103.

Another detainee, Hernandez, was already in Cell 8 when Jacobo arrived with Lopez, Calderon, and Owens. R. 116 at 3, R. 131 at 3. Jacobo had never seen Hernandez before or since that evening. *Id*. Neither Jacobo nor Hernandez had a history of fighting or making threats against other detainees. *Id*. Jacobo told Lopez, Calderon, and Owens that he did not want to be in a cell with another person who he thought would also be suicidal. R. 116 at 2-3, R. 131 at 2-3. Jacobo believed that he was being taken to Cell 8 because he was on suicide watch, and assumed that Hernandez would be as well. *Id*.

Despite his protests, Jacobo was placed in Cell 8. Lopez, Calderon, and Owens left the scene. While in Cell 8, Jacobo was monitored by Defendant Micah, a deputy sheriff. The next 20 minutes were uneventful. Hernandez lay down on the cell floor while Jacobo renewed his requests to be moved from the cell explaining that he did not feel safe with another person in Cell 8. R. 116 at 3, R. 131 at 3.

Detainee Quentin Robinson was then brought to Cell 8 by Lopez, Calderon, Owens, and Adams. *Id*. Defendant Adams is also an ERT member and sheriff's deputy. R. 116 at 2, R. 131 at 1. Jacobo protested Robinson's placement into the cell to Lopez, Calderon, Owens, and Adams. R. 103-2 at 8. In addition to his general concern about sharing Cell 8 with two other detainees he presumed to be on suicide watch, Jacobo had specific concerns regarding Robinson. Robinson was very aggressive when he was brought to the cell and Lopez, Calderon, Owens, and Adams had to force him into Cell 8. *Id*. Robinson was allegedly threatening the guards during the incident, saying he was going to kill them. *Id*. Jacobo was also concerned that Robinson was drunk or

3

under the influence of drugs. *Id*. Once in Cell 8, Robinson threatened to beat up Jacobo. *Id*. Robinson did not have any type of restraints or handcuffs on in the cell. *Id*.

Once again, Owens, Calderon, Lopez, and Adams left the scene after the detainee (this time Robinson) was placed in Cell 8, leaving deputy Micah to monitor the cell. R. 116 at 3, R. 131 at 3. Jacobo again expressed his concerns for his safety to Micah, explaining that he was afraid to go to sleep because Robinson was threatening to beat him up. R. 103-2 at 8. Indeed, Jacobo was attacked four hours later by Robinson around 3:30 a.m. *Id*.

Jacobo states that he complained to Micah on five different occasions in the period after Robinson's placement into the cell but before the attack. *Id*. at 9. Jacobo alleges that he used the buzzer and banged on the door to get Micah's attention. *Id*. Micah allegedly stopped going over to check at some point despite Jacobo's repeated efforts to get his attention. *Id*. Jacobo claims that Robinson "talk[ed] to himself like a crazy person." *Id*. Robinson also supposedly pointed at Jacobo and said that he was going to kill or hit him. *Id*. Eventually Jacobo, Hernandez, and Robinson went to sleep. Hernandez was sleeping on the bed while Jacobo and Robinson were each sleeping on a separate air mattress on the cell floor. *Id*. at 9.

Jacobo was awoken by Robinson's assault against him at approximately 3:30 that morning. R. 103-2 at 10. Robinson was hitting Jacobo and saying that he was going to kill him. *Id*. Robinson kicked and punched Jacobo and eventually put him into a choke hold. *Id*. Nurse Ramos responded to a loud banging on the door to Cell 8 and

4

saw that Robinson had Jacobo in a choke hold. R. 103 at 3, R. 129 at 1. Owens, Lopez, Calderon, and Adams then entered Cell 8 and removed Robinson. R. 103-2 at 10. Jacobo states that around five minutes passed between him being initially awoken by Robinson's assault and Robinson's removal from the cell. *Id*.

Jacobo was relocated to Cell 10 in the medical unit. *Id*. He was bleeding from his head and nose. *Id*. Nurse Ramos took Jacobo out of Cell 10 and cleaned his face. *Id*. at 11. She states that she examined Jacobo and found a one-half inch laceration on his forehead and a bloody nose, but there was no disfigurement of the nose. R. 103 at 3 ¶ 15. Jacobo believes that Ramos did not do much for him at this time and did not provide him additional bandages while he continued to bleed. R. 103-2 at 11. Jacobo conceded during his deposition, that he did not make any additional complaints to Ramos about his condition. *Id*. Ramos states that Jacobo denied having any nausea or vomiting, and said he did not lose consciousness. R. 103 at 3.

Recognizing that Jacobo needed additional care, Ramos contacted defendant Dr. Kul Sood (an employee of the Will County Jail) at around 4:15 a.m., and informed him that Jacobo had been in a fight and required stitches. R. 103 at 4, R. 129 at 18. (The record does not state where Sood was located when Nurse Ramos called.)

Dr. Sood arrived two hours later, at around 6:30 a.m. R. 103 at 4, R. 129 at 2. The parties disagree about what medial treatment Nurse Ramos provided to Jacobo before Sood's arrival. Jacobo states that he continued to bleed and was in pain during this period. R. 129 at 2. However, during his deposition, Jacobo conceded that he did not tell Ramos that he was in pain. R. 103-2 at 11. Jacobo stated that he was surprised

5

that Ramos did not provide him stitches immediately and that he had to wait for Sood. *Id*. at 18. However, Ramos states that she cannot prescribe medication or apply stitches. R. 103 at 3, R. 129 at 2. Ramos also states that she continued to provide Jacobo with gauze to stop his bleeding and he was monitored both by her and the guards until Sood arrived. R. 103 at 4. Jacobo was able to take a shower and did not make any additional complaints to the guards or Ramos. *Id*.

The parties do not dispute the extent of Sood's medical treatment of Jacobo. When Sood arrived at the Jail, he found Jacobo was in no apparent distress. R. 103 at 4, R. 129 at 2. Jacobo was alert and oriented to person, place, and time. R. 103 at 4-5, R. 129 at 2. His nose had stopped bleeding and he only had some dried blood on his nostril. R. 103 at 5, R. 129 at 2. Jacobo also had a laceration on his forehead that was bleeding slightly and bruising on the bridge of his nose. *Id*.

Sood applied four stitches to the head laceration and prescribed Doxycycline, an antibiotic, and Motrin, a pain medication. *Id*. He also ordered that Jacobo's dressing be changed daily and that he receive Bacitracin, an antibacterial drug. *Id*. Finally, Sood ordered an x-ray of Jacobo's nose. *Id*.

The x-ray of Jacobo's nose was taken later that afternoon by the Suburban Mobile X-Ray company, an outside firm that came to the Jail. *Id*. The x-ray showed that Jacobo suffered a "slight displaced fracture to [his] mid nasal bone." *Id*. Sood conducted a follow up appointment with Jacobo two days later. *Id*. Jacobo said that he was fine and denied having any problems. *Id*. Jacobo was seen a second time by Sood

four days after the incident, and again Jacobo said he was fine. R. 103 at 5-6, R. 129 at 2. During this second follow-up visit, Sood told Jacobo that the x-ray showed a slightly displaced fracture of the mid nasal bone and not to blow his nose too hard. *Id*.

A third follow-up visit occurred six days later, on November 21, 2007. R. 103 at 6, R. 129 at 3. Jacobo complained that he was still in pain and Dr. Sood prescribed him Motrin. *Id*. Sood removed Jacobo's sutures a day later, on November 22. *Id*. Sood saw Jacobo on November 24, and again on November 27, when Sood also prescribed Motrin for Jacobo. *Id*. Sood conducted a final follow-up exam of the nose on December 24, 2007. *Id*. Jacobo did not have any apparent problems and he said that he was fine. *Id*. Jacobo now uses a nasal spray at times to help him clear his nostrils for his breathing, but Jones had not detailed any other long-term consequences from his nose injury. R. 103-2 at 16.

Jacobo's amended complaint brings suit against the Will County Sheriff's Office, Will County Sheriff Paul Kaupas (in his official capacity), and Adams, Owens, Lopez, Calderon, Micah, Sodd, and Ramos in their individual capacities. R. 68. The suit advances two causes of action from the November 14 incident: Count One, a failure to protect claim against Owens, Lopez, Calderon, Adams, and Micah; and, Count Two, denial of medical care against Owen, Lopez, Calderon, Adams, Ramos, and Sood. Jacobo also raises a third cause of action regarding a failure to protect claim from a different incident occurring on January 3, 2008.

II.

There are three motions before the Court: (1) Owens, Micah, Lopez, Kaupas, Adams, and Calderon's motion for summary judgment, R. 114; (2) Ramos and Sood's motion for summary judgment, R. 102; and (3) Jacobo's renewed motion for appointment of counsel, R. 133.

A.   **Jacobo's Renewed Motion For Counsel**

With regard to the renewed motion for appointment of counsel, the previously-assigned judge denied two motions for counsel before the reassignment of the case to this Court. R. 5, 60, 107. Jacobo points out in his present motion that he is a Spanish speaker (an interpreter was needed for his deposition), and counsel would have helped him obtain additional discovery to support his claims. R. 133. However, Jacobo does not state what additional information he desires through discovery, and has not brought a motion under Rule 56(d) of the Federal Rules of Civil Procedure stating that facts are unavailable to him. Accordingly, discovery is closed and the prior denials of appointment of counsel were appropriate.

Moving forward, however, as explained below, some of the claims against the individual deputies will survive summary judgment. Although Jacobo has litigated the case admirably so far, as the case moves into the pre-trial preparation stage (although the Court also encourages settlement negotiations after both sides have reviewed this opinion), it is now time for appointment of counsel. Jacobo now has to prepare a pre-trial order, motions *in limine*, and at trial, would have to present witnesses and cross-examine witnesses. The complexity of the case now exceed his abilities to litigate it on

his own behalf. *Romanelli v. Suliene*, 615 F.3d 847, 851-52 (7th Cir. 2010) (citing *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (*en banc*)). Jacobo's renewed motion for appointment of counsel, R. 133, is granted.

B.  **Defendants' Motions For Summary Judgment**

Turning to the motions for summary judgment, "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to evidence demonstrating a genuine dispute of material fact. *Omnicare v. UnitedHealth Group*, 629 F.3d 697, 705 (7th Cir. 2011) (citations omitted). Evidence relied on by the parties must be competent evidence that would be admissible at trial. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted). Defendants, as the moving parties, have the initial burden of showing there is no genuine dispute and they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). If Defendant meets this burden, Jacobo must respond with specific facts showing that the jury could find in his favor, and that there is a genuine dispute that needs to be decided at trial. *Carmichael*, 605 F.3d at 460 (citing *Anderson*, 477 U.S. at 251-52; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

9

*Wheeler*, 539 F.3d at 634). A genuine material dispute is one that could change the outcome of the suit, and there is evidence sufficient to allow a reasonable jury to return a favorable verdict for the plaintiff. *Spivey v. Adaptive Mktg.*, 622 F.3d 816, 822 (7th Cir. 2010) (citations omitted).

### 1. The Sheriff and Deputies

Jacobo has brought suit against the Will County Sheriff's Office, Will County Sheriff Paul Kaupas (in his official capacity), and deputies Adams, Owens, Lopez, Calderon, and Micah. They have moved for summary judgment on all claims. R. 114. As an initial matter, Jacobo's suit against Sheriff Kaupas in his official capacity is actually a suit against the Sheriff's Office. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). In any event, Jacobo's suit against the Sheriff's Office must be evaluated for municipal liability under *Monell*.

"A municipality may be held liable for a constitutional deprivation under *Monell v. Dep't of Soc. Servs. of City of New York*." *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009) (citing 436 U.S. 658 (1978)). "Misbehaving employees are responsible for their own conduct, 'units of government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 646 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)). "To establish municipal liability under § 1983 . . . a plaintiff must present sufficient

evidence to show that the constitutional violation resulted from a municipal policy, custom or practice." *Waters*, 580 F.3d at 580 (citing *Monell*, 436 U.S. at 694). "To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [municipality], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Village of Thornton*, 604 F.3d 464, 467-68 (7th Cir. 2007) (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000)). Jacobo fails to allege any facts that could demonstrate municipal liability under *Monell*. He only mentions the singular (so far as the complaint alleges) events that occurred to him at the Jail without demonstrating how this is part of a custom or practice sufficient to establish a *Monell* claim. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). (He also does not plausibly suggest how he was harmed by an express policy or decision by a final policymaker. In fact, Jacobo points out that defendants allegedly *violated* the established policies of the Jail by placing him in the cell with other detainees.) Thus, the motion for summary judgment as to the Will County Sheriff's Office and Will County Sheriff Paul Kaupas (in his official capacity) is granted and they are terminated from this action.

The motion for summary judgment as to Adams, Owens, Lopez, Calderon, and Micah is granted in part and denied in part. "The Due Process Clause of the Fourteenth Amendment protects pre-trial detainees from punishment and places a

duty upon jail officials to protect pre-trial detainees from violence." *Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005) (citing *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992)). "Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Lewis v. Richards*, 107 F.3d 549, 552-53 (7th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 831-33 (1994); *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir. 1996) (internal quotation marks omitted)). However, not every act of inmate-on-inmate violence results in a constitutional violation. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

Although the claim arises under the Fourteenth Amendment because Jacobo was a pretrial detainee, the Court applies the deliberate indifference standard that governs Eighth Amendment claims. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). The standard contains both an objective prong, requiring a sufficiently serious risk, and a subjective prong, requiring actual knowledge of the risk. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). As to the objective requirement, Jacobo must show that "(1) he suffered an objectively sufficient serious injury; and (2) he was incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citing *Farmer*, 511 U.S. at 834). A condition that poses a substantial risk of harm is one where the "risks [are] so great that they are almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005). This standard has been analogized to placing a detainee in a cell with

a cobra. *Id.* at 911 (citing *Billman v. Indiana Dep.'t of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995)).

For the subjective element, the official is deliberately indifferent only if he "'effectively condones the attack by allowing it to happen.'" *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Lewis*, 107 F.3d at 553). "[D]efendants [must have] actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from defendants' failure to prevent it." *Santiago*, 599 F.3d at 756 (quoting *Lewis*, 107 F.3d at 553). "Mere negligence or even gross negligence does not constitute deliberate indifference." *Borello*, 446 F.3d at 749. However, "[a] prison official cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Dale*, 548 F.3d at 569 (citations omitted). A reasonable response to a risk can only refute a deliberate indifference claim, but "[t]he ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances." *Id.*

As a threshold point, there is no doubting that Jacobo suffered an objectively sufficient serious injury from Robinson's assault. Jacobo's injuries were quickly diagnosed by Nurse Ramos and Dr. Sood as requiring treatment. *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). Jacobo required stitches and a follow up x-ray revealed a broken nose.

With that said, in order to analyze the failure-to-protect claim in an intelligible way, the Court will subdivide Jacobo's Count One claims into four separate events: (1) Jacobo's initial placement into Cell 8 with Hernandez; (2) Jacobo's complaints to Micah after his placement into Cell 8 with Hernandez but before Robinson's placement in the cell; (3) Robinson's placement into Cell 8 by Lopez, Calderon, Owens, and Adams; and (4) Jacobo's complaints to Micah after Robinson's placement into Cell 8 before the assault.

Jacobo's claim must be rejected as to his initial placement into the cell with Hernandez, as well as his complaints to Micah *before* Robinson's placement in the cell. As a general principle, detainees have no general right to a private jail cell. *Bell v. Wolfish*, 441 U.S. 520, 541 (1979); *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) ("College dorms, hospitals, and military barracks house more than one person to a room without amounting to punishment."). Jacobo provides no evidence to suggest that Hernandez posed a threat or in any way contributed to Robinson's attack. The evidence before the Court at this time shows that Hernandez was a simple bystander who was sleeping when Robinson attacked Jacobo.

Robinson, of course, is the one who attacked Jacobo. According to Jacobo, Robinson was extremely confrontational when he was placed in Cell 8 by Lopez, Calderon, Owens, and Adams. He threatened to kill the guards and Jacobo believed that Robinson was under the influence of drugs or alcohol. R. 103-2 at 8. A correctional official acts with deliberate indifference when he witnesses a volatile situation between two inmates and just walks away without trying to defuse the situation. *Fisher*, 414

F.3d at 664. This case presents a common failure-to-protect fact pattern: placing a dangerous detainee in a cell with the ultimate victim. *Brown*, 398 F.3d at 914-15 (citations omitted). Here Jacobo's evidence, when viewed in the light most favorable to him, shows that Robinson was a dangerous individual who posed a serious risk of violence those around him, even threatening to kill the officers. Lopez, Calderon, Owens, and Adams did not address this situation but instead shoved Robinson into Cell 8, where Robinson ultimately assaulted Jacobo. Summary judgment is denied as to the claim that Lopez, Calderon, Owens, and Adams acted with deliberate indifference by placing Robinson into a cell with Jacobo.

Similarly, Jacobo's renewed calls for help to deputy Micah, once Robinson was in the cell, also comprise a claim that survives summary judgment. Robinson was allegedly threatening Jacobo, and Jacobo claims he called Micah for help several times but was ignored. A correctional official may be held liable when he ignores repeated detainee complaints that he is under the threat of violence and there is a subsequent assault. *Borello*, 446 F.3d at 749 (citing *Velez v. Johnson*, 395 F.3d 732, 736-37 (7th Cir. 2005); *Haley*, 86 F.3d 642); *Brown*, 398 F.3d at 914 (noting that a typical claim often involves a defendant-custodian failing to take protective action after a plaintiff-detainee complained of a feared threat posed by a specific person) (citations omitted).

Finally, the Court notes that the individual deputies' motion for summary judgment does not address the claim (Count Two) that Owen, Lopez, Calderon, and Adams denied Jacobo medical care after the assault by Robinson, and the motion makes only a passing reference to the December 2007 attack (Count Three). These

15

claims do not appear to have been addressed in Jacobo's November 2010 deposition and no evidence was presented in Defendants' Local Rule 56.1 materials on these claims. Naturally, then, these claims also remain in the case.

### 2. The Medical Officials

Jacobo challenges the medical treatment that he received from Nurse Ramos and Dr. Sood in Count Two of the complaint. To make out a claim for deliberate indifference to a medical need, a prisoner must allege that defendants were intentionally indifferent to an objectively serious medical need or condition — negligence, gross negligence, or medical malpractice is insufficient. *Farmer*, 511 U.S. at 834; *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008); *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). Ramos and Sood do not contest for purposes of summary judgment that Jacobo had an objectively serious medical need after Robinson's assault. R. 136 at 1. The motion therefore centers around whether the care they provided constituted deliberate indifference to that medical need.

In evaluating whether a medical professional's actions constitute deliberate indifference, the "'medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). "'Deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional

16

judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Gayton v. McCoy*, 593 F.3d 610, 622-23 (7th Cir. 2010) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)). "'Deliberate indifference is not medical malpractice. . . .'" *Roe*, 631 F.3d at 857 (quoting *Duckworth*, 532 F.3d at 679).

Nurse Ramos and Dr. Sood's actions were within the traditional standard of care and far short of the egregious actions required for deliberate indifference. After the assault, Ramos immediately evaluated Jacobo's condition. R. 103-2 at 10; R. 103 at 3 ¶ 15. Jacobo believes that she should have done more for him during this period, such as providing more bandages to help his bleeding, medicine for his pain, or stitches for his wound. But as Ramos explained, and Jacobo did not refute, as a Registered Nurse she is unable to prescribe medicine or apply stitches. R. 103 at 3 ¶ 17. Notably, Jacobo does not argue that Ramos should have called 911 or rushed him to the hospital when she first evaluated him after the attack. And even if he did argue this, this would simply be a mere disagreement with Ramos's medical decision. That type of disagreement does not establish a deliberate indifference claim. *See Jackson v. Kotter*, 541 F.3d 688, 697-98 (7th Cir. 2008) (citations omitted) ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable choices based on prevailing standards in the field.").

Jacobo's other argument is that Ramos waited too long before calling Dr. Sood. The assault occurred around 3:30 a.m. and Ramos called Sood around 45 minutes later, at 4:15 a.m. "A delay in treatment may constitute deliberate indifference if the delay

exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citations omitted). To be sure, there was a delay between the 3:30 a.m assault and the 4:15 a.m. call. Walking through the 45-minute period, the 3:30 a.m. attack lasted for about five minutes. R. 103-2 at 10. Ramos heard the assault and called Owens, Lopez, Calderon, and Adams, who then relocated Jacobo to Cell 10. *Id.* Jacobo was then evaluated and had his face cleaned by Ramos. *Id.* at 11. The record does not state how much time lapsed between Ramos's evaluation of Jacobo and calling Sood. In any event, the record does show several things happened after 3:30 a.m. but before Ramos could call Sood, including relocating Jacobo to a safe location and conducting an initial medical evaluation.

Furthermore, in order to prevail, Jacobo must show Ramos acted with a reckless state of mind. *Roe*, 631 F.3d at 857. Here, she checked the cell door when she heard the assault, called the ERT to stop the assault, immediately addressed Jacobo's injuries when it was safe to do so, and called Sood in the middle of the night to inform him of Jacobo's condition, around 45 minutes after the assault started. No reasonable jury could conclude that she acted with the recklessness needed to prove a deliberate indifference claim. *Grieveson*, 538 F.3d at 777.

Finally, Jacobo does not present evidence that any of Dr. Sood's actions reflected deliberate indifference. Sood was called at 4:15 a.m and arrived to evaluate Jacobo by 6:30 a.m., three hours after the assault. Jacobo does not suggest that Dr. Sood should have arrived sooner. Sood ordered an x-ray, which was taken later that day. Jacobo

received stitches and necessary medications, and Sood performed a number of follow-up visits, providing additional treatment and medications over the next several days. Jacobo likely has not even shown negligence, let alone deliberate indifference. Nurse Ramos and Dr. Sood's motion for summary judgment, R. 102, is granted and they are terminated from this action.

## III.

In summary, Plaintiff's renewed motion for counsel, R. 133, is granted. Defendants Owens, Micah, Lopez, Kaupas, Adams, Calderon, and Will County Sheriff's Office's motion for summary judgment, R. 114, is granted in part, and denied in part. Summary judgment is granted as to the Will County Sheriff's Office and Sheriff Kaupas (who was sued in his official capacity), and they are terminated from this action. With regard to Adams, Owens, Lopez, Calderon and Micah, summary judgment is granted as to Count One only to the extent that Jacobo is challenging his initial placement in Cell 8 with Hernandez and claiming that he complained to Micah regarding his placement in the cell with Hernandez before Robinson's placement in the cell. Jacobo's claim regarding Robinson's placement in the cell and his later complaints to Micah after Robinson's placement in the cell remain intact. Count Two (deliberate indifference to medical need) and Count Three (a December 2007 failure-to-protect), to the extent that they name Adams, Owens, Lopez, Calderon, and Micah, also remain. Nurse Ramos and Dr. Sood's motion for summary judgment, R. 102, is granted and they are terminated from this action. The case will be set for status on October 18, 2011, at 9 a.m. The Court requests that defense counsel make arrangements for

19

Plaintiff to be available by telephone at the status (or to help newly-appointed counsel make those arrangements).

ENTER:

_____
EDMOND E. CHANG
UNITED STATES DISTRICT JUDGE

Date: September 29, 2011